## UNITED STATES DISTRICT COURT

## DISTRICT OF MINNESOTA

| | |
|---|---|
| MISTY KAY MYERS, | Civil No. 14-473 (JRT/LIB) |
| Plaintiffs, | |
| v. | |
| AITKIN COUNTY, CITY OF BAXTER, CASS COUNTY, CITY OF CHASKA, COOK COUNTY, CITY OF CROSBY, CROW WING COUNTY, MCLEOD COUNTY, MILLE LACS COUNTY, CITY OF MINNEAPOLIS, CITY OF NISSWA, CITY OF PEQUOT LAKES, CITY OF WAITE PARK, MICHAEL CAMPION, RAMONA DOHMAN, JOHN DOES (1-100), DEPARTMENT OF PUBLIC SAFETY DOES (1-30), ENTITY DOES (1-30), and JANE DOES (1-100), | **MEMORANDUM OPINION AND ORDER ON DEFENDANTS' MOTIONS TO DISMISS** |
| Defendants. | |

Jonathan A. Strauss, Lorenz F. Fett, Jr., and Sonia L. Miller-Van Oort, **SAPIENTIA LAW GROUP**, 12 South Sixth Street, Suite 1242, Minneapolis, MN 55402, for plaintiffs.

Erin E. Benson, Margaret A. Skelton, and Timothy A. Sullivan, **RATWIK ROSZAK, AND MALONEY**, 730 Second Avenue South, Suite 300, Minneapolis, MN 55402, for defendants Aitkin County, Cass County, Cook County, Crow Wing County, McLeod County, and Mille Lacs County.

Jon K. Iverson, Stephanie A. Angolkar, and Susan M. Tindal, **IVERSON REUVERS CONDON**, 9321 Ensign Avenue South, Bloomington, MN 55438, for defendants Cities of Baxter, Chaska, Crosby, Nisswa, Pequot Lakes, and Waite Park.

Gregory P. Sautter, Assistant City Attorney, **OFFICE OF THE CITY ATTORNEY**, 350 South Fifth Street, City Hall, Room 210, Minneapolis, MN 55415, for defendant City of Minneapolis.

Oliver J. Larson, Assistant Attorney General, **MINNESOTA ATTORNEY GENERAL'S OFFICE**, 445 Minnesota Street, Suite 1800, St. Paul, MN 55101, for defendants Michael Campion and Ramona Dohman.

This case involves the alleged misuse of private driver's license information by Minnesota law enforcement officers and other individuals. Plaintiff Misty Kay Myers ("Myers"), a northern Minnesota attorney, brings this case against six Minnesota counties, seven Minnesota cities, former Minnesota Department of Public Safety ("DPS") Commissioner Michael Campion, current Commissioner Ramona Dohman, and other unnamed individuals and entities. She alleges that law enforcement officers of the defendant cities and counties illegally accessed her private driver's license information eighty-four times, in violation of the Driver's Privacy Protection Act ("DPPA"), her Fourth and Fourteenth Amendment rights, and her Minnesota common law privacy rights. She asserts that the Department of Public Safety defendants are also culpable because they created a poorly managed database that allows law enforcement officers to access driver's license data illegally.

The City of Minneapolis, the other defendant cities and counties, and the DPS defendants all move to dismiss Myers's complaint, arguing she has failed to state a plausible claim for relief and that many of her claims are barred by the statute of limitations. The Court agrees that many of Myers's claims are time-barred by the applicable statute of limitations and fail to state plausible constitutional or common law privacy claims. The Court therefore will grant the motions to dismiss, in part. Nevertheless, because some of Myers's remaining claims state facts that reasonably lead

to the inference that law enforcement officers did violate the DPPA when accessing her driver's license information, the Court will deny the motions to dismiss, in part.

## BACKGROUND

## I.   PARTIES AND COMPLAINT

Myers is an attorney in Brainerd, Minnesota, who is currently serving as the in-house counsel for the National Joint Powers Alliance. (Compl. ¶¶ 35-38, 46, Feb. 20, 2014, Docket No. 1.)  She has served or is currently serving as an Assistant City Prosecutor, president of the Crow Wing/Aitkin County Bar Association, and as a board member, volunteer, or attorney for several other entities (e.g., non-profit organizations, the Crow Wing County DWI Court, etc.). (*Id.* ¶¶ 38-45.)  Her husband is a Brainerd police officer. (*Id.* ¶¶ 47-48.)

A division of DPS, the Driver and Vehicle Services Division ("DVS") maintains a database that holds the motor vehicle records of all Minnesota drivers ("DVS Database"). (*Id.* ¶ 49.)  Myers alleges that this database contains various pieces of "personal information" and "highly restricted personal information," as defined by 18 U.S.C. § 2725, for Myers and every Minnesota driver, including Myers's name, date of birth, driver's license number, address, driver's license photo, weight, height, Social Security number, health and disability information, and eye color. (*Id.* ¶ 50.)  Drivers must provide this information to obtain a license in Minnesota. (*Id.* ¶¶ 51-52, 214-15.)

Myers alleges that DPS freely gives access to the database to law enforcement officers, and also non-government employees, and that those officers access the database

by using a password and not by demonstrating that they have a permissible reason to obtain or use the information.  (*Id.* ¶¶ 122-24, 157-61, 223-26.)  Myers claims there is no effective system employed to control access or stop illegal obtainment of the information.  (*Id.* ¶¶ 213, 217-22.)  Moreover, until recently, DPS refused to share publicly whether a person's information had been accessed, even though its stated policy called for transparency.  (*Id.* ¶¶ 186-89.)  Myers obtained information about searches of her name in the DVS Database in July of 2013.  (*Id.* ¶ 193.)

Specifically, Myers makes allegations against the following entities and individuals:

- Defendants Aitkin County, Cass County, Cook County, Crow Wing County, McLeod County, and Mille Lacs County ("counties");
- Defendant Cities of Baxter, Chaska, Crosby, Nisswa, Pequot Lakes, and Waite Park ("cities");
- Defendant City of Minneapolis;
- Defendant Commissioners of Public Safety Michael Campion and Ramona Dohman;
- Defendants John and Jane Does (1-100), acting in their individual capacities as supervisors, officers, deputies, staff, investigators, employees, or agents of other governmental agencies;
- Department of Public Safety ("DPS") Does (1-30), acting in their individual capacities as officers, supervisors, staff, employees, independent contractors, or agents of the Minnesota Department of Public Safety; and
- Entity Does (1-30), including cities, counties, municipalities, and other entities sited in Minnesota.

(*Id.* ¶¶ 12-34.)  Myers contends that employees of the city and county defendants illegally obtained or used her private driver's license data eighty-four times.  (*Id.* ¶¶ 63-110.)  She alleges that defendants viewed not just her basic driver's license information, but also her

Social Security number and medical information.[1]  (*Id.* ¶ 114.)  She contends that she is a well-known attorney and has not been involved in criminal activity or suspected of such activity; therefore no permissible reason to access the information exists and the defendants were instead accessing the information for impermissible personal reasons, due to her notoriety or their romantic attraction to her.  (*Id.* ¶¶ 111-18, 198-99.) Moreover, the searches were of Myers's name, and not of a driver's license or license plate number, and some searches were late at night.  (*Id.* ¶ 118, Ex. A.)

The following table shows the searches conducted in the DVS database of Myers's name:

| Entity | Sub-Entity | Date/Time[2] |
|---|---|---|
| Aitkin County | Sheriff | 4/7/10, 10:48 |
| Aitkin County | Sheriff | 4/7/10, 10:49 |
| Aitkin County | Sheriff | 3/24/11, 22:00 |
| City of Baxter | Police Department | 1/11/08, 20:48 |
| City of Baxter | Police Department | 1/11/08, 20:49 |
| Cass County | Sheriff | 2/8/08, 9:27 |
| Cass County | Sheriff | 2/8/08, 9:29 |
| Cass County | Sheriff | 2/14/08, 15:39 |
| Cass County | Sheriff | 2/14/08, 15:39 |
| Cass County | Sheriff | 9/24/08, 10:49 |
| City of Chaska | Police Department | 1/27/08, 9:41 |
| Cook County | Sheriff | 9/21/12, 10:41 |
| City of Crosby | Police Department | 12/20/07, 18:52 |
| City of Crosby | Police Department | 12/20/07, 18:56 |
| City of Crosby | Police Department | 2/28/08, 18:07 |
| Crow Wing County | County Attorney | 6/1/11, 7:47 |

---

[1] As the Court will discuss below, at oral argument, Myers to some extent backed away from her claim that the DVS Database gives law enforcement officers access to medical information or Social Security numbers.

[2] Times are listed in twenty-four-hour format, just as they are in Myers's Exhibit A.

| | | |
|---|---|---|
| Crow Wing County | County Attorney | 7/26/11, 10:17 |
| Crow Wing County | Probation | 7/8/09, 15:28 |
| Crow Wing County | Probation | 4/26/11, 13:38 |
| Crow Wing County | Probation | 5/1/12, 9:14 |
| Crow Wing County | Sheriff | 12/28/07, 15:27 |
| Crow Wing County | Sheriff | 12/28/07, 15:28 |
| Crow Wing County | Sheriff | 2/5/08, 10:29 |
| Crow Wing County | Sheriff | 2/21/08, 12:16 |
| Crow Wing County | Sheriff | 2/22/08, 17:04 |
| Crow Wing County | Sheriff | 3/6/08, 13:58 |
| Crow Wing County | Sheriff | 4/21/08, 1:32 |
| Crow Wing County | Sheriff | 4/30/08, 14:34 |
| Crow Wing County | Sheriff | 5/13/08, 14:32 |
| Crow Wing County | Sheriff | 5/13/08, 14:33 |
| Crow Wing County | Sheriff | 5/13/08, 14:33 |
| Crow Wing County | Sheriff | 5/23/08, 12:28 |
| Crow Wing County | Sheriff | 5/23/08, 12:28 |
| Crow Wing County | Sheriff | 8/27/08, 14:46 |
| Crow Wing County | Sheriff | 8/27/08, 14:46 |
| Crow Wing County | Sheriff | 8/28/08, 21:10 |
| Crow Wing County | Sheriff | 3/5/09, 13:58 |
| Crow Wing County | Sheriff | 3/5/09, 13:58 |
| Crow Wing County | Sheriff | 3/5/09, 15:17 |
| Crow Wing County | Sheriff | 6/22/09, 23:13 |
| Crow Wing County | Sheriff | 9/30/09, 8:38 |
| Crow Wing County | Sheriff | 1/8/10, 7:07 |
| Crow Wing County | Sheriff | 1/8/10, 7:08 |
| Crow Wing County | Sheriff | 1/8/10, 7:08 |
| Crow Wing County | Sheriff | 2/20/10, 3:05 |
| Crow Wing County | Sheriff | 2/20/10, 3:05 |
| Crow Wing County | Sheriff | 2/20/10, 3:05 |
| Crow Wing County | Sheriff | 6/4/10, 16:21 |
| Crow Wing County | Sheriff | 6/4/10, 16:22 |
| Crow Wing County | Sheriff | 6/4/10, 16:22 |
| Crow Wing County | Sheriff | 9/1/10, 7:39 |
| Crow Wing County | Sheriff | 9/1/10, 7:39 |
| Crow Wing County | Sheriff | 9/1/10, 7:43 |
| Crow Wing County | Sheriff | 5/12/11, 8:47 |
| Crow Wing County | Sheriff | 5/2/12, 9:27 |
| Crow Wing County | Sheriff | 5/2/12, 9:28 |
| DNR | | 11/27/09, 16:37 |

| Human Services | | 2/10/09, 7:14 |
|---|---|---|
| Human Services | | 5/29/09, 16:40 |
| Human Services | | 5/29/09, 16:41 |
| Human Services | | 6/9/09, 16:43 |
| City of Little Falls | Deputy Registrar | 7/20/10, 10:16 |
| City of Little Falls | Deputy Registrar | 7/20/10, 10:16 |
| McLeod County | Sheriff | 4/22/08, 14:16 |
| Mille Lacs County | County Attorney | 8/4/10, 15:35 |
| Mille Lacs County | County Attorney | 8/4/10, 15:35 |
| Mille Lacs County | County Attorney | 8/18/10, 12:44 |
| Mille Lacs County | County Attorney | 8/19/10, 9:53 |
| Mille Lacs County | County Attorney | 8/19/10, 9:53 |
| Mille Lacs County | County Attorney | 8/24/10, 14:39 |
| Mille Lacs County | County Attorney | 8/24/10, 14:39 |
| Mille Lacs County | County Attorney | 9/10/10, 11:18 |
| Mille Lacs County | County Attorney | 9/30/10, 15:30 |
| Mille Lacs County | County Attorney | 10/8/10, 11:34 |
| Mille Lacs County | County Attorney | 10/8/10, 11:34 |
| Mille Lacs County | Sheriff | 9/21/10, 1:19 |
| City of Minneapolis | Police Department | 5/30/09, 19:48 |
| City of Nisswa | Police Department | 2/25/08, 16:18 |
| City of Nisswa | Police Department | 4/16/08, 11:06 |
| City of Nisswa | Police Department | 4/16/08, 11:07 |
| City of Nisswa | Police Department | 10/1/08, 15:52 |
| City of Pequot Lakes | Police Department | 2/25/08, 21:57 |
| City of Pequot Lakes | Police Department | 9/26/09, 3:12 |
| City of Waite Park | Police Department | 1/16/11, 13:22 |

(*Id.*, Ex. A.)

As for the DPS Does and Commissioners Dohman and Campion, Myers alleges that DPS officials created a system that allowed for law enforcement officials and non-government employees to access personal information illegally. (*Id.* ¶¶ 119-50.) Despite their knowledge of the widespread misuse of the database and illegal obtainment of

personal information,[3] (*id.* ¶¶ 234-44), Myers claims that DPS officials, specifically the Commissioners, continued to keep in place the faulty database access system and procedures.  (*Id.* ¶¶ 245-52.)  They made no changes, even though they knew that other states use systems and procedures that better protect drivers' privacy.  (*Id.*)  More broadly, Myers accuses defendant entities, supervisors, and DPS Commissioners and Does of failing to adequately train DVS database users, and of having lax policies and enforcement of those policies and "no viable method of . . . ascertaining and controlling the illegal access to individuals' private information by their officers."  (*Id.* ¶¶ 208-213.)

Based on these allegations, Myers filed a complaint against the defendant entities and individuals listed above on February 20, 2014.  (*Id.* ¶¶ 12-34.)  She alleges violations of the United States Constitution, the DPPA, 42 U.S.C. § 1983, and her Minnesota common law privacy rights, and seeks monetary damages and injunctive relief.  (*Id.* ¶¶ 1, 231.)

## II.   DPPA ALLEGATIONS

The DPPA, 18 U.S.C. § 2721, *et seq.*, provides a private right of action to a person whose driver's license information is misused:

A person who knowingly obtains, discloses or uses personal information, from a motor vehicle record, for a purpose not permitted under this chapter

---

[3] Myers notes that Commissioner Dohman has a long history in law enforcement, including as Maple Grove Police Chief.  (*Id.* ¶ 235-37.)  Commissioner Campion was supervisor of the Bureau of Criminal Apprehension ("BCA"), which maintains its own driver's license database.  (*Id.* ¶ 239.)  Finally, the Minnesota Legislative Auditor has testified at a legislative hearing that at least 50% of law enforcement officers are misusing the DVS database.  (*Id.* ¶ 242.)

shall be liable to the individual to whom the information pertains, who may bring a civil action in a United States district court.

18 U.S.C. § 2724(a).  In Count I, Myers seeks to hold all defendants liable under this section of the statute.

Myers alleges that the individual defendants "knowingly obtained, disclosed or used Myers'[s] personal information, from a motor vehicle record, for a purpose not permitted under the DPPA."  (Compl. ¶ 261.)  Each defendant was acting within the scope of his or her employment and knew that their actions were in violation of the DPPA.  (*Id.* ¶¶ 263-64.)  And none of the defendants' activities fell within the list of permitted exceptions for procurement of private information.  (*Id.* ¶ 262.)

Myers claims that defendant entities and defendant supervisors "knowingly authorized, directed, ratified, approved, acquiesced in, committed or participated in obtaining, disclosing or using of Myers' private personal information by [the] Individual Defendants."  (*Id.* ¶ 265.)  By setting up, maintaining, and refusing to change the database, and accompanying procedures, Myers alleges that the DPS Commissioners, and the entities and supervisors, knowingly disclosed Myers's personal information, impermissibly, under the DPPA.  (*Id.* ¶¶ 266-70.)

Myers argues that, under the DPPA, she is "entitled to a baseline liquidated damages award of at least $2,500 for each violation of the DPPA.  18 U.S.C. § 2721(b)(1)."  (*Id.* ¶ 275.)  She argues that she need not prove actual damages to receive liquidated damages.  (*Id.*)

### III.   SECTION 1983 ALLEGATIONS

In Count II, Myers sues all individual defendants, including Jane and John Does, under 42 U.S.C. § 1983.  (*Id.* ¶¶ 276-93.)  She argues that the defendants violated her Fourth Amendment right to be free from an unconstitutional search and her Fourteenth Amendment substantive due process right to privacy.  (*Id.* ¶¶ 278-79, 283.)  Myers supports her constitutional claims by pointing to the DPPA.  That statute, she asserts, clearly establishes that "obtaining an individual's Private Data without a legitimate purpose constitutes an illegal search under the meaning of the Fourth Amendment as well as a violation of their substantive due process right to privacy under the Fourteenth Amendment."  (*Id.* ¶¶ 281-82.)

Pointing to the allegations discussed above, Myers claims that the individual defendants, acting under the color of state law, invaded Myers's clearly established constitutional rights, and knew that their actions violated those rights.  (*Id.* ¶¶ 286-90.)  She seeks damages in excess of $75,000, along with punitive damages and attorneys' fees under 42 U.S.C. § 1988.  (*Id.* ¶ 291-93.)

In Count III, Myers sues entity defendants and supervisor defendants, including John, Jane, and Entity Does, for violating Section 1983 as well.  (*Id.* ¶¶ 294-316.)  She claims that these defendants know well, or should have known, that law enforcement officers and others illegally and improperly obtain information in the DVS database, in violation of their own internal rules and procedures.  (*Id.* ¶¶ 297-98, 300.)  Improper access is so common that it has become "an official custom or practice" well known to supervisors.  (*Id.*)  Despite this knowledge, Myers alleges that entity defendants fail to

monitor these customs and practices and fail to enforce their official rules.  (*Id.* ¶ 299.) Myers concludes that both entity and supervisor defendants are liable due to their actual and constructive knowledge of these wrongful customs and practices, a failure to institute a process to monitor and prevent them, deliberate indifference to the rights of victims like Myers, and a failure to train, monitor, supervise, and properly discipline employees.  (*Id.* ¶¶ 303-08.)  Myers seeks damages of more than $75,000 due to mental suffering, punitive damages, and attorneys' fees pursuant to Section 1988.  (*Id.* ¶¶ 314-16.)

In her final Section 1983 claim, Myers sues the Commissioner Defendants and all DPS Does in Count IV.  (*Id.* ¶¶ 317-34.)  She claims that these defendants "created or oversaw the creation and maintenance of" the DVS database and, by failing to take steps to prevent unauthorized or improper access, "allowed [the] unauthorized access of" Myers's personal information roughly eighty-four times.  (*Id.* ¶¶ 323-24.)  She claims Commissioners and DPS Does have been negligent in supervising subordinates in charge of the database and have failed to properly monitor it.  (*Id.* ¶¶ 325-28.)  These actions have displayed a deliberate indifference to the rights of citizens like Myers and, indeed, have directly violated those rights.  (*Id.* ¶¶ 322, 329.)  As a result, Myers seeks more than $75,000 in damages for mental and physical suffering, punitive damages, and Section 1988 attorneys' fees.  (*Id.* ¶¶ 332-34.)

## IV.    COMMON LAW INVASION OF PRIVACY ALLEGATIONS

Finally, in Count V, Myers alleges Minnesota common law invasion of privacy against all defendants.  (*Id.* ¶¶ 335-40.)  She alleges that the defendants "intentionally

intruded upon the solitude or seclusion of [her] private affairs and concerns," and that these intrusions were highly offensive, caused her severe emotional distress and physical harm, and were intended to cause such harm.  (*Id.* ¶¶ 336-39.)  As a result, she seeks tort damages.

## V.    MOTIONS TO DISMISS

Defendant City of Minneapolis filed a motion to dismiss on March 25, 2014. (Def. City of Minneapolis's Mot. to Dismiss ("Minneapolis Mot. to Dismiss"), Mar. 25, 2014, Docket No. 7.)   Defendants Aitkin County, Cass County, Cook County, Crow Wing County, McLeod County, and Mille Lacs County brought their motion to dismiss on May 15, 2014.   (Defs. Aitkin County, Cass County, Cook County, Crow Wing County, McLeod County, and Mille Lacs County's Mot. to Dismiss or Sever ("Counties' Mot. to Dismiss"), May 15, 2014, Docket No. 16.)  Defendant Cities of Baxter, Chaska, Crosby, Nisswa, Pequot Lakes, and Waite Park brought their motion to dismiss the next day, on May 16, 2014.   (Def. Cities of Baxter, Chaska, Crosby, Nisswa, Pequot Lakes, and Waite Park's Mot. to Dismiss or Sever ("Cities' Mot. to Dismiss"), May 16, 2014, Docket No. 24.)  Finally, DPS Commissioners Dohman and Campion brought a motion to dismiss on June 24, 2014.  (Defs. Ramona Dohman and Michael Campion's Mot. to Dismiss ("DPS Mot. to Dismiss"), June 24, 2014, Docket No. 33.)

## DISCUSSION

## I.    STANDARD OF REVIEW

In reviewing a motion to dismiss brought under Federal Rule of Civil Procedure 12(b)(6), the Court considers all facts alleged in the complaint as true to determine if the complaint states a "'claim to relief that is plausible on its face.'"  *See, e.g.*, *Braden v. Wal–Mart Stores, Inc.*, 588 F.3d 585, 594 (8th Cir. 2009) (quoting *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009)).  To survive a motion to dismiss, a complaint must provide more than "'labels and conclusions' or 'a formulaic recitation of the elements of a cause of action.'"  *Iqbal*, 556 U.S. at 678 (quoting *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 555 (2007)).  Although the Court accepts the complaint's factual allegations as true, it is "not bound to accept as true a legal conclusion couched as a factual allegation."  *Bell Atl. Corp.*, 550 U.S. at 555 (internal quotation marks omitted).

"A claim has facial plausibility when the plaintiff pleads factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged."  *Iqbal*, 556 U.S. at 678.  "Where a complaint pleads facts that are merely consistent with a defendant's liability, it stops short of the line between possibility and plausibility," and therefore must be dismissed.  *Id.* (internal quotation marks omitted).  Rule 12(b)(6) also authorizes the Court to dismiss a claim on the basis of a dispositive legal issue. *Neitzke v. Williams*, 490 U.S. 319, 326-27 (1989).

## II.        STATUTE OF LIMITATIONS

The Court must decide whether Myers's DPPA claims are barred by the applicable statute of limitations.[4]   The DPPA contains no explicit statute of limitations provision. *See* 18 U.S.C. § 2724.  As a result, since the statute was enacted after 1990, *see Reno v. Condon*, 528 U.S. 141, 143 (2000), the general catchall statute of limitations found in 28 U.S.C. § 1658 applies to DPPA claims.  *See Jones v. R.R. Donnelley & Sons Co.*, 541 U.S. 369, 382 (2004) (concluding that Section 1658 governs statutory claims that contain no explicit statute of limitations and are "made possible by a post-1990 [statutory] enactment").

Section 1658 contains the following two provisions:

(a) Except as otherwise provided by law, a civil action arising under an Act of Congress enacted after the date of the enactment of this section may not be commenced later than 4 years after the cause of action accrues.

(b) Notwithstanding subsection (a), a private right of action that involves a claim of fraud, deceit, manipulation, or contrivance in contravention of a regulatory requirement concerning the securities laws, as defined in section 3(a)(47) of the Securities Exchange Act of 1934 . . . may be brought not later than the earlier of—

(1) 2 years after the discovery of the facts constituting the violation; or

(2) 5 years after such violation.

28 U.S.C. § 1658.

---

[4] The parties also dispute whether Myers's Section 1983 and Minnesota invasion of privacy claims are time-barred.  Because the Court concludes that Myers has failed to state viable Section 1983 and privacy claims in her complaint, the Court will not consider these statute of limitations arguments.

Since this case does not involve one of the claims listed in Section 1658(b), Section 1658(a) applies here and the parties dispute only when a "cause of action **accrues**" under that provision (i.e., when the four-year limitations period begins to run). *Id.* § 1658(a) (emphasis added).  Defendants argue that the standard accrual rule should apply when determining when a cause of action accrues.  Under the standard rule, "a claim accrues when the plaintiff has a complete and present cause of action" (i.e., in this case, on the dates when Myers's information was illegally accessed).  *Gabelli v. S.E.C.*, 133 S. Ct. 1216, 1220 (2013) (internal quotation marks omitted).  Myers argues that the discovery rule applies.  Under the discovery rule, the cause of action does not accrue until a plaintiff has discovered it.  *Merck & Co., Inc. v. Reynolds*, 559 U.S. 633, 644 (2010); *see also Union Pac. R.R. Co. v. Beckham*, 138 F.3d 325, 330 (8th Cir. 1998) (stating that under the discovery rule, "a plaintiff's cause of action accrues when a claimant knows, or should know through an exercise of reasonable diligence, of the acts constituting the alleged violation" (internal quotation marks omitted)).

A.     **Eighth Circuit's Discovery Rule Presumption**

The Eighth Circuit has generally applied the discovery rule as the default rule when interpreting statutes of limitations in federal question cases.  *Comcast of Ill. X v. Multi-Vision Elecs., Inc.*, 491 F.3d 938, 944 (8th Cir. 2007) ("In federal question cases, the discovery rule applies in the absence of a contrary directive from Congress." (internal quotation marks omitted)); *see also Maverick Transp., LLC v. U.S. Dep't of Labor*, 739 F.3d 1149, 1154 (8th Cir. 2014) (concluding that the Supreme Court in *TRW Inc. v.*

*Andrews*, 534 U.S. 19 (2001), did not "invalidate the presumption of reading the discovery accrual rule into federal statutes" and that, as a result, the *Comcast* decision "remains good law").

Defendants argue that the Eighth Circuit's presumption in favor of the discovery rule has not survived recent Supreme Court decisions. *See, e.g.*, *Smythe v. City of Onamia*, No. 12-3149, 2014 WL 4096966, at *3 (D. Minn. Aug. 19, 2014) ("As this Court and other courts in this district have held, *Gabelli* appears to have overruled, at least in part, the Eighth Circuit's preference for the discovery rule."). The Supreme Court has discussed the discovery rule in several recent cases. In *TRW*, the Court analyzed the statute of limitations period in the Fair Credit Reporting Act ("FCRA"), 15 U.S.C. § 1681p, which, at the time, included a general limitations period that allowed actions to be brought "within two years from the date on which the liability arises" and also contained an exception that employed the discovery rule when there had been willful misrepresentation of information that needed to be disclosed to the plaintiff. 534 U.S. at 22 (internal quotation marks omitted). The Court rejected the Ninth Circuit's limitations-period doctrine, which applied the discovery rule to all federal statutory limitations periods unless Congress had **explicitly** stated otherwise (i.e., an implicit rejection of the discovery rule, apparent from the structure of the statute, was not enough to require use of the accrual rule under the Ninth Circuit's precedent). *Id.* at 27-28. As for Section 1681p, the Court concluded that the existence of the fraud exception demonstrated Congress's implicit intent not to apply the discovery rule to the general limitations

period.  *Id.* at 28 ("The most natural reading of § 1681p is that Congress implicitly excluded a general discovery rule by explicitly including a more limited one.").

In *Merck & Co., Inc. v. Reynolds*, 559 U.S. 633, 644 (2010), the Court analyzed Section 1658 itself, interpreting Section 1658(b).  559 U.S. at 638.  Relevant to this case, it concluded that the term "discovery" in Section 1658(b) encompassed either the point when the plaintiff actually discovered his claim **or** the point at which a reasonably diligent plaintiff would have discovered it.  *Id.* at 648.  The Court reasoned that Congress's usage of the word "discovery" refers not just to the point of actual discovery, but instead is a term of art that refers to the discovery rule (which starts the limitations period either at the time of discovery or when a reasonable person would have discovered it).  *Id.* at 644-48.  The Court traced the history of the discovery rule, which originated in fraud cases where the harm was often difficult or impossible for a victim to discover.  *Id.* at 645-46.  The Court noted that Congress had now begun using the word "discovery" in fraud and non-fraud statutes alike and that when it did so, it was explicitly applying the discovery rule.  *Id.*

In *Gabelli*, which involves a government civil enforcement action, the Court interpreted the limitations period in 28 U.S.C. § 2462, which states "'an action . . . for the enforcement of any civil fine, penalty, or forfeiture . . . shall not be entertained unless commenced within five years from the date when the claim first accrued.'"  133 S. Ct. at 1220 (quoting § 2462).  The Court noted that the most natural reading to apply to the statute was the standard accrual rule.  *Id.* at 1220-21 (stating that "[i]n common parlance a right accrues when it comes into existence" and noting that dictionaries have long

defined "accrue" as "when the plaintiff has a right to commence" the action (internal quotation marks omitted)).  The SEC argued for applying the discovery rule in order to save its enforcement action.  *Id.* at 1221.  Noting that the discovery rule – "an 'exception' to the standard rule" – arose out of fraud actions by defrauded plaintiffs unable to discover the wrong that gave rise to their claim, the Court rejected the government's argument and applied the standard accrual rule to Section 2462.  *Id.* at 1221-24 ("Applying a discovery rule to Government penalty actions is far more challenging than applying the rule to suits by defrauded victims, and we have no mandate from Congress to undertake that challenge here.").

After considering all three of these Supreme Court cases, this Court concludes that, absent an explicit statement to the contrary by the Eighth Circuit, the presumption in favor of the discovery rule still applies, in general.  First, none of the Supreme Court cases discussed above have explicitly held to the contrary.  Indeed, while all three traced the discovery rule's roots to fraud cases, and while *TRW* rejected the Ninth Circuit's more expansive presumption in favor of the discovery rule, none of these cases explicitly rejected the more limited presumption employed by the Eighth Circuit.  No better evidence of that fact exists than the Eighth Circuit's recent decision in *Maverick Transportation, LLC*.  In that case, which was decided after *TRW*, *Merck*, and *Gabelli*,[5] the Eighth Circuit applied its presumption in favor of the discovery rule, as articulated in the *Comcast* case, to conclude that since nothing in the Surface Transportation Assistance

---

[5] *Maverick Transportation, LLC* does not mention *Gabelli*, but it was decided almost a year after the Supreme Court's *Gabelli* decision.

Act ("STAA") indicated Congress's intent to exclude the discovery rule, the Department of Labor did not act impermissibly in applying the discovery rule in the STAA context. 739 F.3d at 1154 (citing *Comcast of Illinois X*, 491 F.3d at 944, for the proposition that the discovery rule applies absent direction from Congress to the contrary). The panel majority rejected the dissent's argument that *TRW* precluded the application of the general discovery rule presumption, noting that *TRW* had rejected the **Ninth** Circuit's presumption, not the more limited one employed by the Eighth. *Id.* It concluded that *Comcast*, and its discovery rule presumption, "remains good law." *Id.* Thus, even after *Gabelli* and the other Supreme Court cases the defendants cite, the Eighth Circuit has reaffirmed, explicitly, its commitment to the common law discovery rule presumption it has long employed. This Court is bound to accept the Eighth Circuit's decision. *BPS Guard Servs., Inc. v. NLRB*, 942 F.2d 519, 524 (8th Cir. 1991).

Finally, to the extent defendants argue the Eighth Circuit's discovery rule presumption is barred by the *Gabelli* decision explicitly, even despite *Maverick Transportation, LLC*, they are correct that the *Gabelli* Court characterizes the discovery rule – at least in describing its origins – differently than the Eighth Circuit in *Comcast*: as having arisen as an "'exception' to the standard rule." *Gabelli*, 133 S. Ct. at 1221; *see, e.g.*, *Potocnik v. Carlson*, 9 F. Supp. 3d 981, 993 (D. Minn. 2014) (acknowledging *Maverick Transportation, LLC's* re-affirmation of the *Comcast* discovery rule presumption, but noting that the case "did not even mention *Gabelli*, much less attempt to reconcile *Gabelli's* holding that the discovery rule is the 'exception' with *Comcast's* holding that the discovery rule is the norm").

However, it is important not to get too far ahead of the Supreme Court's actual holding in *Gabelli* by reading the case to be an explicit repudiation of any type of discovery rule presumption.  While the *Gabelli* Court did delve into the origins and underlying purposes of the discovery rule generally, it also based its decision not to apply the discovery rule to the SEC's civil enforcement action in part on the fact that the SEC is a government investigative and enforcement entity seeking to punish a wrongdoer, not a victim seeking recompense from fraud or an otherwise hard-to-discover wrong.   133 S. Ct. at 1221-22.  Thus, while the *Gabelli* decision makes generalized statements about the discovery rule's primary purpose being to root out fraud, *id.*, its reasoning and holding is not necessarily dispositive here because this case does not involve a government civil enforcement action.   Thus, in accordance with *Maverick Transportation, LLC*, the Court holds that the discovery rule presumption of *Comcast of Illinois X* is still good law despite the Supreme Court's decision in *TRW*, *Merck*, and *Gabelli*.

### B.     Discovery Rule, Section 1658, and the DPPA

Although the Eighth Circuit in *Maverick Transportation, LLC*, reaffirmed the continued viability of the discovery rule presumption, that presumption still only applies if Congress has not provided a contrary directive in the statute.  *See Comcast of Ill. X*, 491 F.3d at 944.  Here, the statute contains two provisions.  Section 1658(a) was enacted in 1990, as a part of the Judicial Improvements Act of 1990.  Pub. L. No. 101-650, § 313 (1990).  That provision contains a general four-year limitations period that begins to run

"after the cause of action accrues." 28 U.S.C. § 1658(a). The purpose of the Judicial Improvements Act was, in large part, to reduce cost and delay in civil litigation in the United States. Pub. L. No. 101-650, § 102.

The second provision, Section 1658(b), was enacted in 2002, as a part of the Sarbanes-Oxley Act of 2002. The law's legislative history indicates that earlier, and shorter, statutes of limitations for fraud cases – which often left fraud victims no recourse and insulated the very worst fraud offenders – led Congress to enact the longer limitations period found in Section 1658(b). *See* S. Rep. No. 107-146, at *7, *11 (2002). Indeed, the report explicitly states that shorter fraud provisions would help Enron – the large energy company whose financial crimes led to the enactment of Sarbanes-Oxley – escape some of its victims. *Id.*

Thus, the structure of Section 1658, following its amendment by Sarbanes-Oxley, is similar to the limitations period the Court interpreted in *TRW*: it sets out a general rule, the four-year limitations period in Section 1658(a), and an exception, the two-pronged provision in Section 1658(b) that employs a limited version of the discovery rule and applies in cases of fraud, deceit, or manipulation. 534 U.S. at 22. Granted, Section 1658 is not the same as the limitations provision in the FCRA, but the lessons of *TRW* apply equally to this statute. In order to make the civil litigation system faster and more efficient, Congress enacted a general limitations provision. Then, in the wake of the Enron accounting scandal, in order to give fraud victims more time to pursue civil claims, it added to Section 1658 a more generous limitations period that includes a limited version of the discovery rule.

Considering the language of both statutory provisions, and their history and context, Myers's proposed interpretation does not hold up.  It would be nonsensical for Congress to enact a limitations period in Section 1658(a) – as a part of a law seeking to speed up civil litigation – that is broad, generous, and almost unlimited, due to the application of the general discovery rule.  It would make even less sense for Congress to follow that action by enacting a more limited discovery rule provision in Section 1658(b), as a part of a law that seeks to give plaintiffs more time to assert fraud claims (fraud cases being where the discovery rule originated).  But that result is what Myers's interpretation leads to: an almost unlimited limitations period in Section 1658(a) based solely on the date of discovery of harm, versus a limited multi-pronged limitations period in Section 1658(b) for fraud cases that provides a maximum limitations period of five years.  Given the structure of the statute, and the purposes underlying the Judicial Improvements Act and Sarbanes-Oxley, Myers's interpretation cannot have been the intention of Congress.  Instead, as in *TRW*, by enacting a more limited discovery rule provision in Section 1658(b), as a part of a multi-pronged limitations statute intended to give fraud victims more time to make claims, "Congress implicitly excluded a general discovery rule by explicitly including a more limited one."  534 U.S. at 447.

Myers argues that, because Section 1658(b) includes both a version of the discovery rule and the accrual rule, Congress meant for it to stand alone and have no bearing on the meaning of Section 1658(a).  But Congress does not legislate in a vacuum.  It added Section 1658(b) more than six months after the decision in *TRW*, a decision that established with specificity how the Supreme Court would interpret a statute that

provides a general limitations period along with a fraud exception that employs the discovery rule.  Federal courts assume that "when Congress enacts statutes, it is aware of relevant judicial precedent."  *Merck & Co., Inc.*, 559 U.S. at 648.  Thus, if Congress had intended Section 1658(a) to embody a broad and general discovery rule, especially in light of *TRW*, it could have done so explicitly, instead of later adding a second provision that employs a narrower version of the discovery rule in the fraud context.  The Court rejects the argument that Congress intended for these two statutory provisions to have no bearing on each other.  Thus, because of the contrary directive provided by Congress in Section 1658, the Court concludes that the Eighth Circuit's discovery-rule presumption does not apply to Section 1658(a) and the accrual rule applies instead.  *See Comcast of Ill. X*, 491 F.3d at 944 ("In federal question cases, the discovery rule applies in the absence of a contrary directive from Congress." (internal quotation marks omitted)).

Finally, as to the DPPA itself, Myers has not shown why, given this Court's conclusion that the discovery rule does not apply to Section 1658(a), the DPPA is the sort of statute that would trigger the discovery rule regardless.  The information she seeks is important, and the statute protects significant privacy rights on the part of individual citizens, but she has provided no evidence that it is difficult for a plaintiff to discover a DPPA injury within four years of it occurring.  *Gabelli*, 133 S. Ct. at 1222 ("The discovery rule exists in part to preserve the claims of victims who do not know they are injured and who reasonably do not inquire as to any injury.")  Here, even if a victim does not know he or she was injured, it is relatively easy to contact the DPS from time to time and request an audit.  While Myers alleges that the DPS formerly concealed this

information, according to her own complaint Myers was able to obtain an audit when her name was accessed as soon as she sought it.  (Compl. ¶¶ 191-93.)  Thus, the DPPA does not benefit from the discovery rule either.

In sum, while the discovery rule presumption stands in the Eighth Circuit, the Court concludes that it does not apply to Section 1658(a) and it does not apply to the DPPA.  As a result, the four-year limitations period in Section 1658(a) runs from the time of the occurrence(s) of the alleged injuries against Myers.  Myers filed her complaint on February 20, 2014.  (Compl.)  Thus, to fit within the statute of limitations period, the alleged illegal obtainment of her driver's license information must have occurred on or after February 20, 2010.  The Court will therefore dismiss as time-barred those DPPA claims that are based on allegedly illegal access of Myers's information in the DVS Database prior to February 20, 2010.[6]

## III.   FAILURE TO STATE A CLAIM

### A.   DPPA Claims

In order to state a DPPA claim, a plaintiff must establish three elements: "(1) the defendant knowingly obtains, discloses or uses personal information; (2) from a motor

---

[6] The following forty-nine DPPA claims, each based on individual accesses of Myers's information through the DVS Database, are time-barred: two claims against the City of Baxter, five claims against Cass County, one claim against the City of Chaska, three claims against the City of Crosby, twenty-five claims against Crow Wing County, any claims tied to the DNR and Human Services accessing of Myer's information, one claim against McLeod County, one claim against the City of Minneapolis, four claims against the City of Nisswa, and two claims against the City of Pequot Lakes.  The DPPA claims based on the thirty-five instances of allegedly illegal access on or after February 20, 2010 are not time-barred.

vehicle record; and (3) for a purpose not permitted." *Taylor v. Acxiom Corp.*, 612 F.3d 325, 335 (5th Cir. 2010); *see also Thomas v. George, Hartz, Lundeen, Fulmer, Johnstone, King, & Stevens, P.A.*, 525 F.3d 1107, 1111 (11th Cir. 2008).   To establish the third element, the plaintiff must show that the "obtainment, disclosure, or use was not for a purpose enumerated under [18 U.S.C.] § 2721(b)." *Taylor*, 612 F.3d at 335 (internal quotation marks omitted).   One of the permitted purposes under Section 2721(b) – the only one relevant to this case – is "[f]or use by any government agency, including any court or law enforcement agency, in carrying out its functions."   18 U.S.C. § 2721(b)(1).

### 1.   Scope of the Term "Obtain" in the DPPA

The Court must determine whether Myers's remaining thirty-five DPPA claims have been pled sufficiently to survive the defendants' motions to dismiss.   The counties first argue that, even if law enforcement officers did improperly access the DVS database and view Myers's driver's license information, that improper accessing and viewing does not amount to improperly "obtain[ing]" the information, which the statute requires.   18 U.S.C. § 2724(a).   Webster's Dictionary defines "obtain" as to "gain or attain possession or disposal of usu. by some planned action or method."   Webster's Third New International Dictionary 1559 (3d ed. 2002).   Citing the definition of "obtain," the counties argue that the term requires more than merely accessing a database or viewing information; it requires the action of **acquiring**, which Myers has failed to allege.

The counties' argument ignores the fact that personal biographical information, such as a name, an address, or the matching of one's name to a photo of one's face (i.e.,

one's physical appearance), is not as easy to categorize or break down as a physical object.  For instance, a person has not obtained, or gained or attained possession of, a bowling ball, merely by looking at it.  Looking at a bowling ball, but not gaining or attaining possession of it, would leave a person hard-pressed to use the bowling ball later at a bowling alley.  But if a person views or accesses another's personal driver's license information using an electronic database, she has then possessed that information in the sense that she could recall a person's name, driver's license number, or physical appearance, and use that information (either to investigate that person as a part of a criminal investigation or for another more nefarious purpose, such as identity theft).  Thus, the act of "obtaining," in the context of non-physical driver's license information, is similar to and overlaps with the act of viewing or accessing that information in the DVS Database.  The only way to distinguish between the two would be to attempt to identify whether law enforcement officers simply viewed and ignored (i.e., did not remember) some information, while retaining other information.  That sort of fact-intensive inquiry might arise in specific cases, but the possibility that in some instances a person with access to the DVS Database might have viewed driver's license information and then promptly forgotten it, in a way that would not amount to obtaining or acquiring it, does not change the fact that in most cases the two terms overlap, and viewing or accessing driver's license information will amount to obtaining it.

The counties also argue that Congress has specifically proscribed "viewing" or "accessing," when it wants to bar more passive conduct than "obtaining."  For example, 18 U.S.C. § 1030(a) bars intentionally "accessing" a nonpublic U.S. government

computer, or exceeding authorized access.  The counties are correct that Congress has explicitly proscribed certain passive conduct, like accessing certain computers or systems, or accessing or viewing child pornography.  *See id.*; *id.* § 2252(4)(B).  But the DPPA statutory scheme targets, and Myers alleges, more than mere access.  The plain language of the DPPA is focused not on access alone, but on the obtainment of protected personal information.  18 U.S.C. § 2724(a).  While "obtainment" implies more than "access" (e.g., viewing child pornography or logging into a protected computer), it is also distinguished in the statute from more active conduct by a defendant, such as "disclos[ing]" or "us[ing]" personal information.  *Id.*  And "access" is a necessary predicate to "obtain[ing]" personal information, especially if that information is held in an electronic database, like the DVS Database.  Indeed, one of the statutes the counties cite acknowledges the relationship between improperly accessing a computer or system and consequently "obtain[ing]" protected government information.  *See* 18 U.S.C. § 1030(a)(2)(B) (criminalizing "intentionally access[ing] a computer without authorization or exceed[ing] authorized access, and thereby obtain[ing] . . . information from any department or agency of the United States").

In *United States v. Teague*, the Eighth Circuit affirmed a U.S. Department of Education contractor's conviction for violating Section 1030(a)(2)(B).  646 F.3d 1119, 1120 (8th Cir. 2011).  In that case, the defendant, who had privileged access to the National Student Loan Data System, searched for and viewed President Barack Obama's student loan records.  *Id.* at 1121.  The court rejected a sufficiency of the evidence challenge, concluding that the government had met its burden of showing that the

defendant exceeded her authorized access and thereby **obtained** information from a government department (i.e., President Obama's loan records) when it showed she had access to a system that would allow her to view the President's loan records and that someone using her unique user ID had "viewed [his] private information." *Id.* at 1121-23. Thus, the government met its high burden in a criminal case under Section 1030 of showing both access and obtainment using evidence similar to the evidence presented by Myers in this case. *Id.* Myers has presented evidence that, on at least eighty-four occasions, people with access to the DVS Database viewed her personal driver's license information. In light of how the Eighth Circuit has interpreted statutes like Section 1030, the Court concludes this evidence is sufficient to show "obtainment" under the DPPA, at least at this stage of the proceedings.[7]

## 2.      Improper Purpose

The next question, then, is whether Myers has alleged sufficiently that the obtaining of her driver's license information in this case was not for a permitted purpose (i.e., not "[f]or use by any government agency . . . in carrying out its functions"). 18 U.S.C. §§ 2721, 2724. The cities and counties argue that, excluding sheer speculation and generalized allegations, Myers has failed to allege more than the "date[s] of access,

---

[7] To the extent any defendant counters with the argument that such an interpretation will encompass passive and fully appropriate law enforcement behavior, that argument misses a critical provision in the DPPA: a civil cause of action arises only if the defendant knowingly obtained personal information "**for a purpose not permitted.**" 18 U.S.C. § 2724(a) (emphasis added). That important caveat restricts the scope of the statute, without having to stretch the interpretation of the term "obtain."

and . . . the type of data accessed." (Mem. in Supp. of City of Minneapolis's Mot. to Dismiss or Sever ("Minneapolis Mem.") at 7, Mar. 25, 2014, Docket No. 10.) Given the presumption that law enforcement officers properly discharge their duties, *United States v. Chem. Found.*, 272 U.S. 1, 14-15 (1926) ("[I]n the absence of clear evidence to the contrary, courts presume that they have properly discharged their official duties."), the defendants contend that simply listing the dates of access by county and city law enforcement officers is insufficient to show an improper purpose.[8]

The Court concludes that, in this case, Myers has made a sufficient showing on the remaining thirty-five DPPA claims to survive a motion to dismiss. Myers makes several allegations that demonstrate, at least at this early stage of the proceedings, that the searches of her name and obtaining of her personal information were not for a permitted purpose. First, the searches in the DVS Database were of her name, not of her license plate or driver's license number. (Compl. ¶ 118.) In other words, these searches were not, for example, of Myers as an unidentified driver speeding quickly by a police officer, prompting a DVS Database search to check the record attached to a license plate number. Instead, the searches were focused on Myers specifically. But, Myers alleges that she did not commit any crimes, was not suspected of any criminal activity or a part of any criminal investigation, was not involved in any civil litigation, and never sought out the

---

[8] The defendants also point to other decisions in this District that have rejected DPPA claims. That argument is unavailing, however, both because this case is distinguishable and because those decisions are not binding on this Court. *S. Stud & Component, Inc. v. Am. Eagle Design Build Studios, LLC*, 588 F.3d 963, 967 (8th Cir. 2009) ("[O]ne district court is not bound by the holdings of others, even those within the same district.").

assistance of law enforcement.  (Compl. ¶¶ 118, 198.)  Consequently, Myers argues no permissible explanation exists for why law enforcement officials or others with access to the DVS Database would be obtaining her information "in carrying out [their] functions." 18 U.S.C. § 2721(b)(1); *see also Rollins v. City of Albert Lea*, No. 14-299, 2014 WL 6908708, at *17-*18, *36 (D. Minn. Dec. 8, 2014) (rejecting, in part, a motion to dismiss a DPPA claim against Hennepin County because, in part, the plaintiff's "personal information was searched not by license plate number, but rather, by her name," and because the plaintiff had not committed any crimes or been informed that she was suspected of any criminal behavior).

The searches also took place at a variety of times, including late at night.  (Compl., Ex. A.)  For example, Myers's information was pulled at 10:00pm, 1:19am, and 3:05am. (*Id.*)  While it is true, as defendants argue, that law enforcement officers do work late, Myers alleges that it is especially difficult to provide a permissible reason for these late-night searches, much less any of the others, if she has not committed any crimes or been tied to any criminal investigations.  There were also a significant number of searches – eighty-four in total.  *See Kolls v. City of Edina*, No. 14-370, 2014 WL 5810332, at *5 (D. Minn. Nov. 7, 2014) (stating that the "volume of lookups alone is insufficient to allow a plaintiff to state a claim" but also that "it can be relevant factual support for a claim"); *see also Pinski v. City of Cottage Grove*, No. 14-325, 2014 WL 5810364, at *5 (D. Minn. Nov. 7, 2014) (rejecting a motion to dismiss in part because the defendants searched the plaintiff's name ninety-six times).

Myers also notes that she is a well-known attorney, especially in the Brainerd, Minnesota area where she lives and works, who has done public legal work that would make her a known entity to law enforcement.  (*Id.* ¶¶ 35-46.)  In addition, she is married to a Brainerd law enforcement officer.  (*Id.* ¶¶ 47-48.)  In other words, Myers is the type of established and connected attorney that might prompt law enforcement officers to search for her information on the DVS Database for purely personal reasons, either out of curiosity or due to a possible romantic attraction to her.  Indeed, most of the searches of Myers's name occurred in counties or cities near where she works.  *Kolls*, 2014 WL 5810332, at *5.

Finally, Myers points to a February 2013 report by the State of Minnesota's Office of the Legislative Auditor, which "estimated that over half of the law enforcement users of the DVS [Database] may have used it to perform questionable queries in fiscal year 2012."[9]  (Evaluation Report: Law Enforcement's Use of State Databases ("Report"), at 25-26, Apr. 15, 2014, Docket No. 14-1.)  This objective evidence, which highlights misuse of the DVS Database in general, provides additional support for Myers's claims, when combined with the specific facts of her case.  In sum, Myers's allegations – the number, timing, and types of searches; her public profile; her lack of ties to criminal activity or investigations of any type; and the Auditor's report that calls into question

---

[9] The Court notes one caveat regarding the Legislative Auditor's report: the report lists its own examples of appropriate versus inappropriate uses of DVS data.  (Report at 25.)  Because this decision does not rest entirely on the conclusions of the Auditor's report, this Court need not, and does not, decide whether the examples of appropriate versus inappropriate usage of the DVS Database listed in the report are the same as the permissible versus impermissible usage envisioned by the DPPA.

over half of law enforcement searches using the DVS Database – in the aggregate, provide sufficient "factual content [to] allow[] the court to draw the reasonable inference that the defendant[s]" obtained Myers's driver's license information for a purpose not permitted under the DPPA. *Iqbal*, 556 U.S. at 678.

Defendants argue these allegations are insufficient, claiming that even if Myers had ruled out some permissible purposes, she has failed to allege, with specificity, which impermissible purpose motivated these DVS Database searches. They contend that allowing Myers to proceed would effectively allow any person with ties to law enforcement and no criminal history or background to get beyond the motion to dismiss stage in DPPA claims. *See, e.g.*, *Mitchell v. Aitkin Cnty.*, No. 13-2167, 2014 WL 835129, at *7 (D. Minn. Mar. 4, 2014) (stating, in a case in which the plaintiff made similar allegations to Myers in this case, that "relying on facts about the plaintiff . . . provides no coherent and workable way to distinguish between DPPA claims that should survive a motion to dismiss and those that should not," and concluding that to accept the plaintiff's position "would entail accepting that every woman with no criminal background and some unspecified level of fame and/or attractiveness can state a DPPA claim against any local governmental entity with an employee that accessed her data"). But Myers has provided more than the mere allegation that she is a well-known or attractive attorney, or that she has no criminal background. Instead, she offers up a variety of factors – including her professional prominence and ties to law enforcement, the timing and number of the searches, her husband's profession, the fact that the searches were by name, the fact that she had not committed any criminal behavior or been tied to any

criminal investigation, and the Legislative Auditor's telling report on misuse of the DVS Database.

It is true that other decisions in this District have rejected DPPA claims based on some of these factors. *See, e.g.*, *Potocnik v. City of Minneapolis*, No. 14-1215, 2014 WL 4829454, at *3-*4 (D. Minn. Sept. 29, 2014) (dismissing as speculative a DPPA claim based on "the number of times of [the plaintiff's] record was accessed, the odd hours of some of the look-ups, and the curiosity surrounding [the plaintiff's] resignation" from the Minneapolis Police Department); *Mitchell*, 2014 WL 835129, at *6-*9 (rejecting as generalized and speculative a DPPA claim based on look-ups of the plaintiff by name, reports of widespread abuse of the DVS Database, the plaintiff's public status as a television personality, and her lack of involvement in criminal activity). But, it is also true that Myers has provided a longer and more detailed list of allegations than in cases like *Potocnik* or *Mitchell*, which, when combined, raise a reasonable inference of a DPPA violation. Myers's case is closer to the plaintiff's in *Mallak v. Aitkin County*, in which the Court denied a motion to dismiss where the plaintiff alleged or cited 190 accesses of her name by unnamed law enforcement officers, a state report of DVS Database misuse, no involvement by her in criminal activity, her status as a well-known and involved attorney, and searches at odd hours of the night. 9 F. Supp. 3d 1046, 1058 (D. Minn. 2014); *see also Heglund v. Aitkin Cnty.*, No. 14-296, 2014 WL 4414821, at *6 (D. Minn. Sept. 5, 2014) (denying in part a motion to dismiss a DPPA claim in which the plaintiff cited a state report detailing extensive misuse of the database; and alleged that the DVS Database look-ups were of her name, the plaintiff is a well-known law enforcement

officer, most of the look-ups occurred in the county where she lived, her husband was a likely suspect, and her husband's name was searched almost simultaneously with her name on two occasions). As such, Myers has provided sufficient factual allegations to distinguish her case from the other DPPA cases rejected in this district, and, more generally, to draw a reasonable dividing line between viable and non-viable DPPA claims.

To the extent the defendants argue Myers has failed to identify the specific impermissible purpose behind the searches of her name, they attempt to foist a greater burden on Myers than the DPPA does. The civil action provision of the DPPA subjects to liability a defendant who "knowingly obtains . . . personal information, from a motor vehicle record, for a purpose not permitted" by the DPPA. 18 U.S.C. § 2724(a). The statute also explicitly lists permissible uses, such as for use by a government agency "in carrying out its functions." *Id.* § 2721(b)(1). But the statute does not list impermissible uses, nor does the civil action provision require, on its face, that a plaintiff list the specific impermissible purpose that spurred a defendant to look up her information. *See Rollins*, 2014 WL 6908708, at *18 ("At this early stage of litigation, Plaintiff need not plead – and indeed, does not know without discovery – the precise impermissible purpose for which her information was accessed."); *cf. Maracich v. Spears*, 133 S. Ct. 2191, 2195 (2013) (noting that the DPPA "regulates the disclosure of personal information" and stating that "[d]isclosure of personal information **is prohibited unless for a purpose permitted** by an exception listed in 1 of 14 statutory subsections" (emphasis added)). Here, Myers has met her burden, at least at this stage of the proceedings, by providing

allegations sufficient to raise a reasonable inference that the defendants did not access her information for any permissible reason, thus leaving them only with impermissible reasons for their searches. *See Taylor*, 612 F.3d at 335 (stating that a plaintiff demonstrates that the obtainment of information under Section 2724 was for a purpose not permitted by showing that the "obtainment . . . was not for a purpose enumerated under § 2721(b)"). While it is true that plaintiffs have provided more detail in some cases, *see, e.g.*, *Heglund*, 2014 WL 4414821, at *6 (plaintiff specifically alleged that searches were by her ex-husband, based in part on the fact that the unidentified searcher had searched her name and her ex-husband's name at the same time), Myers has made sufficient allegations, based on what she knows.

Indeed, one problem with the defendants' argument is that they cannot identify what Myers could do, if anything, to survive a motion to dismiss, with the limited information DPS provides in its audit of database searches. At oral argument, defendants speculated that Myers might be able to get beyond a motion to dismiss by making personalized allegations about specific law enforcement officers. But adopting such a requirement, given that DPS does not provide the name of those who made the DVS Database searches, would require unnecessary speculation and, practically, would bar from the reach of the courts an entire subset of DVS Database abuses. The Court also rejects a related argument: that Myers's allegations are too speculative. *See Kinserlow v. CMI Corp.*, 217 F.3d 1021, 1026 (8th Cir. 2000) ("A reasonable inference is one which may be drawn from the evidence without resort to speculation." (internal quotation marks omitted)). But, as discussed above, Myers has done more than offer conclusory

allegations and recitations of the elements, which would leave the Court with no choice but to speculate. *See, e.g.*, *Bass v. Anoka Cnty.*, 998 F. Supp. 2d 813, 821 (D. Minn. 2014) (quoting *Kinserlow*, 217 F.3d at 1026, and rejecting as speculative a DPPA claim based solely on "the number of times defendants allegedly accessed the record"). Instead, she has offered a number of factual allegations that, when taken together, lead to the reasonable inference that her personal information was accessed for reasons other than those permitted under the DPPA.

Finally, to the extent the defendants pin their motion to dismiss on Congressional intent underlying the DPPA or to the presumption that public officials have properly discharged their official duties, both arguments fall short. It is true that the DPPA was largely enacted "in response to safety concerns about the ease with which individuals could obtain [personal driver's license] information from the state, as well as concerns about direct marketers who used this information for commercial purposes without drivers' consent." *Cook v. ACS State & Local Solutions, Inc.*, 663 F.3d 989, 992 (8th Cir. 2011); *see also Mitchell*, 2014 WL 835129, at *7-*8 (stating that Congress did not intend for the DPPA to create "a broad and automatic entitlement to discovery of the reasons a law enforcement officer retrieves an individual's personal information"). But one must not overstate the language of the DPPA. The DPPA does state that government access to driver's license information is permitted under the act, but it does not give the government carte blanche to access the DVS Database information for any purpose. Instead, the use must be by a government agency "**in carrying out its functions**." 18 U.S.C. § 2721(b)(1) (emphasis added). In other words, a law enforcement officer, using

the access he has pursuant to his law enforcement position, to view and obtain personal driver's license data for a personal reason, or any reason that does not relate to his employing agency's functions, is, within the strict terms of the statute, in violation of the DPPA.[10] *Id.* §§ 2721, 2724.

Whatever its main target, the DPPA also explicitly contemplates and encompasses misuse by government officials and a properly pled complaint can survive a motion to dismiss and reach that government misuse. *See, e.g.*, *Smythe v. City of Onamia*, No. 12-3149, 2013 WL 2443849, at *5 (D. Minn. June 5, 2013) ("**With the exception of misuse**, the DPPA's legislative history indicates a desire to preserve broad discretion for law enforcement agents to retrieve information **in the course of their duties**." (emphasis added)). For similar reasons, the Court rejects the argument that the presumption that

---

[10] Minneapolis also argues that Myers's DPPA claims against the county and city units, based on vicarious liability for their employees, fail because those employees, if they did misuse the DVS Database, were operating outside the scope of their employment. *See Burlington Indus., Inc. v. Ellerth*, 524 U.S. 742, 756-57 (1998) (stating, in a sexual harassment vicarious liability case, that employers are liable for the torts of their employees that are within the scope of employment and defining the scope of employment, pursuant to the Restatement (Second) of Agency, as conduct being "actuated, at least in part, by a purpose to serve the [employer]" (internal quotation marks omitted)). In the alternative, Minneapolis argues, if the employees were acting within the scope of their employment, those searches would be for a permissible purpose under the DPPA. 18 U.S.C. § 2721(b)(1).

This argument ignores the fact that the scope-of-employment analysis in cases like *Burlington Industries*, which involves the intentional tort of sexual harassment, arises in a different context than in this case. Different than an intentional tort case, Myers alleges the improper obtainment of private information by individual defendants, in violation of a statutory scheme and using access credentials to a database that are provided as a part of their employment. The "Court is reluctant to import vicarious liability analyses from other areas of law" with such limited briefing from the parties on the issue, especially given the factual differences between a case like *Burlington Industries* and this one. *Longen v. Fed. Express Corp.*, 113 F. Supp. 2d 1367, 1377 (D. Minn. 2000).

public officers have "'properly discharged their official duties'" is dispositive in this case. *See, e.g.*, *Potocnik*, 2014 WL 4829454, at *3 (quoting *Chem. Found, Inc.*, 272 U.S. at 14-15). Here, Myers has provided clear evidence to the contrary, most obviously the State Auditor's report, which rebuts the public-officer presumption in this case. In sum, Myers has adequately pled those DPPA claims that are not time-barred and the defendants' motions to dismiss as to those claims are denied.[11]

## B.     Section 1983

### 1.     Statutory Claims

Myers also alleges DPPA violations via 42 U.S.C. § 1983. (Compl. ¶¶ 231, 276-334.) The defendants respond that Congress, through its enactment of the DPPA, intended to foreclose the use of Section 1983 to enforce statutory rights protected by the DPPA. The Court considered, but did not resolve, this issue in a prior case because the Court concluded that the plaintiffs in that case had failed to state a statutory claim on the merits. *Gulsvig v. Mille Lacs Cnty.*, No. 13-1309, 2014 WL 1285785, at *7 (D. Minn. Mar. 31, 2014). In this case, however, because the Court has determined that Myers has stated a DPPA claim sufficiently to survive a motion to dismiss, it must now determine whether Myers may also assert a DPPA statutory claim under Section 1983.

---

[11] The counties also argue that three of Myers's claims against Crow Wing County, based on the alleged illegal access of her information by Crow Wing County probation officers, must be dismissed. (Mem. of Law in Supp. of Counties' Mot. to Dismiss ("Counties' Mem.") at 28, May 15, 2014, Docket No. 18.) The probation employees work for a joint powers entity, separate and distinct from any named entity defendant. (*Id.*) The Court will grant the counties' motion to dismiss Myers's claims based on access of the DVS Database by Crow Wing County probation officers.

Section 1983 provides plaintiffs with a federal cause of action to sue government officials acting under color of state law for deprivations of "rights, privileges, or immunities secured by the Constitution and laws" of the United States. *See* 42 U.S.C. § 1983. "It is well recognized that a plaintiff may use section 1983 to enforce not only rights contained in the Constitution, but also rights that are defined by federal statutes." *Alsbrook v. City of Maumelle*, 184 F.3d 999, 1010-11 (8th Cir. 1999). However, Section 1983 vindicates only "'the violation of a federal **right**, not merely a violation of federal **law**.'" *Midwest Foster Care & Adoption Ass'n v. Kincade*, 712 F.3d 1190, 1195 (8th Cir. 2013) (quoting *Blessing v. Freestone*, 520 U.S. 329, 340 (1997)).

In order to demonstrate that a statute creates an individually enforceable right, a plaintiff must show that "(1) Congress intended the statutory provision to benefit the plaintiff; (2) the asserted right is not so 'vague and amorphous' that its enforcement would strain judicial competence; and (3) the provision clearly imposes a mandatory obligation upon the states." *Lankford v. Sherman*, 451 F.3d 496, 508 (8th Cir. 2006) (quoting *Blessing*, 520 U.S. at 340-41). If a statute meets the three factors of the *Blessing* test, "it is presumptively enforceable under § 1983." *Midwest Foster Care & Adoption Ass'n*, 712 F.3d at 1195-96.

A defendant can rebut this presumption, however, "by showing either that Congress explicitly foreclosed a remedy under § 1983 or implicitly did so, by creating a comprehensive enforcement scheme that is incompatible with individual enforcement." *Id.* at 1196 (internal quotation marks omitted). The Eighth Circuit has held that courts ought to "presume that Congress intended that the enforcement mechanism provided in [a

federal] statute be exclusive." *Alsbrook*, 184 F.3d at 1010-11 (concluding that the enforcement mechanism provided in the Americans with Disabilities Act ("ADA") precluded a suit to enforce the ADA under Section 1983).

Assuming, without deciding, that Myers has met the three prongs of the *Blessing* test and the DPPA is presumptively enforceable under Section 1983, the Court nevertheless concludes that the DPPA provides a "comprehensive enforcement scheme" that precludes enforcement via Section 1983. *Midwest Foster Care & Adoption Ass'n*, 712 F.3d at 1196. In *City of Rancho Palos Verdes v. Abrams*, 544 U.S. 113 (2005), the Supreme Court clarified that "[t]he provision of an express, private means of redress in the statute itself is ordinarily an indication that Congress did not intend to leave open a more expansive remedy under § 1983." *Id.* at 121. More explicitly, the Court stated that "the existence of a **more restrictive** private remedy for statutory violations has been the dividing line between those cases in which we have held that an action would lie under § 1983 and those in which we have held that it would not." *Id.*

In this case, Congress has provided an explicit private remedy in 18 U.S.C. § 2724. The statue allows civil suits in federal court, and provides for actual and liquidated damages, punitive damages, attorneys' fees and costs, and such other relief as the court deems appropriate. *Id.* The statute also provides for criminal penalties. 18 U.S.C. § 2723. Moreover, the statue is more restrictive than Section 1983. It is subject to a statute of limitations period – the four-year period found in 28 U.S.C. § 1658(a) –

that is shorter than the six-year period generally applicable to Section 1983 claims in Minnesota.[12] *Rasmusson v. Chisago Cnty.*, 991 F. Supp. 2d 1065, 1073 (D. Minn. 2014).

Citing *Collier v. Dickinson*, 477 F.3d 1306 (11th Cir. 2007), Myers argues that she is seeking merely an "alternative" and complementary form of relief under Section 1983, and not relief that is barred by the DPPA. But the court in *Collier* did not thoroughly assess and compare the remedial schemes in Section 1983 and the DPPA, beyond labeling them "complementary." *Id.* at 1311. Pursuant to *City of Rancho Palos Verdes*, the Court concludes that a more detailed analysis is required that takes into account how the remedial scheme in the federal statutory regime at issue compares with Section 1983 and, most importantly, whether the remedial scheme in question is more restrictive. For similar reasons, the Court is not persuaded by Myers's citation to *Arrington v. Richardson*, 660 F. Supp. 2d 1024, 1037 (N.D. Iowa 2009). In sum, like other courts in this district and elsewhere, the Court finds Myers cannot pursue statutory claims under Section 1983. *See, e.g.*, *Mallak*, 9 F. Supp. 2d at 1059-61; *Kraege v. Busalacchi*, 687 F. Supp. 2d 834, 840 (W.D. Wis. 2009) ("Because the Act has a more restrictive private remedy, I conclude that plaintiffs' § 1983 claim to enforce their rights under the Act is barred.")

---

[12] Although the defendants claim that a four-year limitations period applies to a Section 1983 claim in this case, (Minneapolis Mem. at 27; Counties' Mem. at 27), this Court looks instead to the six-year limitations period that is generally applied to Section 1983 actions in Minnesota. *See Egerdahl v. Hibbing Cmty. Coll.*, 72 F.3d 615, 618 n.3 (8th Cir. 1995) ("In Minnesota, § 1983 claims are governed by the six-year limitations period of Minnesota's personal-injury statute, Minn. Stat. § 541.05, subd. 1(5). *Berg v. Groschen*, 437 N.W.2d 75, 77 (Minn. Ct. App. 1989).").

### 2.      Constitutional Claims

Myers also alleges constitutional violations under Section 1983, including a violation of her constitutional right to privacy.  (Compl. ¶¶ 276-93.)   The defendants argue Myers has failed to allege sufficiently a right-to-privacy claim.

In *Whalen v. Roe*, 429 U.S. 589, 603-04 (1977), the Supreme Court recognized that the "individual interest in avoiding disclosure of personal matters" may sometimes rise to the level of a constitutional right.   In that case, the Court concluded that New York's practice of maintaining a database of patients prescribed with Schedule II drugs did not amount to an invasion of "any right or liberty protected by the Fourteenth Amendment."  *Id.*   Courts applying *Whalen* have found a right to privacy in limited circumstances, as "the personal rights found in the guarantee of personal privacy must be limited to those which are 'fundamental' or 'implicit within the concept of ordered liberty.'"  *Cooksey v. Boyer*, 289 F.3d 513, 516 (8th Cir. 2002) (alterations omitted) (quoting *Paul v. Davis*, 424 U.S. 693, 713 (1976)).  The Eighth Circuit has explicitly limited the scope of such a right:

> [W]e hold that to violate Appellant's constitutional right of privacy the information disclosed must be either a shocking degradation or an egregious humiliation of her to further some specific state interest, or a flagrant breech of a pledge of confidentiality which was instrumental in obtaining the personal information.

*Alexander v. Peffer*, 993 F.2d 1348, 1350 (8th Cir.1993).

This standard "set[s] a high bar implicitly hold[s] that many disclosures, regardless of their nature, will not reach the level of a constitutional violation."  *Cooksey*, 289 F.3d

at 516.  "To determine whether a particular disclosure satisfies this exacting standard, [courts] must examine the nature of the material opened to public view to assess whether the person had a legitimate expectation that the information would remain confidential while in the state's possession."  *Eagle v. Morgan*, 88 F.3d 620, 625 (8th Cir.1996).  This right to privacy protection, analyzed in *Eagle* in the context of the public dissemination of the plaintiff's criminal record, "extends only to highly personal matters representing the most intimate aspects of human affairs."  *Id.* (internal quotation marks omitted).  As the Eighth Circuit noted, "courts have traditionally been reluctant to expand this branch of privacy beyond those categories of data which, by any estimation, must be considered extremely personal."  *Id.* (collecting cases finding right to privacy for shared spousal information, certain financial records, the naked body, and medical records, but not criminal records or even false rumors of a crime).

Given the Eighth Circuit's guidance in *Eagle*, the Court concludes, as it did in *Gulsvig*, 2014 WL 1285785, at *8-*9, that most of the information obtained in this case – allegedly Myers's address, photograph, date of birth, weight, height, eye color, and driver's license number – does not constitute the kind of intimate or extremely personal information that gives rise to constitutional protection.[13]  *See, e.g.*, *Collier*, 477 F.3d at 1308 (no constitutional violation when releasing personal information provided to state

---

[13] Myers cites *Maracich v. Spears*, 133 S. Ct. 2191, 2202 (2013), which traces the legislative history of the DPPA and discusses the importance of the information the law protects, especially "the most sensitive kind of information, including medical and disability history and Social Security numbers."  But that case is not binding or particularly relevant to Myers's constitutional claim, because it dealt only with a DPPA claim, and not any allegations of a constitutional violation.  *Id.* at 2195-96.

DMV to mass marketers); *Wiles v. Ascom Transp. Sys., Inc.*, 478 F. App'x 283, 295 (6th Cir. 2012) (no constitutional privacy violation for bulk sale of information covered by DPPA); *Mallak*, 9 F. Supp. 3d at 1061-63 ("No case has yet found that a constitutional right to privacy exists under the Fourth or Fourteenth Amendment for the type of information typically found in driver's licenses and protected by the DPPA (address, color photograph, date of birth, weight, height, and eye color)."); *Rasmusson*, 991 F. Supp. 2d at 1074-77 ("[T]he disclosure of this information [address, color photograph, date of birth, weight, height, eye color, driver identification number], cannot be considered shockingly degrading or egregiously humiliating.").

In her complaint, Myers also alleges that the DVS Database includes personal medical information about her, as well as her Social Security number.  (Compl. ¶ 114.) As this Court noted in *Gulsvig*, a plaintiff might have a more viable constitutional claim if he or she alleges that medical information and Social Security numbers were also accessed.  2014 WL 1285785, at *9 (quoting *In re Crawford*, 194 F.3d 954, 958 (9th Cir. 1999) ("[T]he indiscriminate public disclosure of SSNs, especially when accompanied by names and addresses, may implicate the constitutional right to informational privacy." (footnote omitted)); *cf. Maracich*, 133 S. Ct. at 2202 (assessing a DPPA, but not constitutional, claim and noting that medical and disability history and Social Security numbers are the "most sensitive" and "highly personal").  *But see Cassano v. Carb*, 436 F.3d 74, 75 (2[d] Cir. 2006) ("[T]he Constitution does not provide a right to privacy in one's [Social Security number].").

The City of Minneapolis disagrees with Myers's claim that the DVS Database contains medical information and Social Security numbers, arguing instead that it is an indisputable matter of public record that the DVS Database "does not display social security numbers or medical information when accessed by law enforcement." (Minneapolis Mem. at 11.)  Indeed, the Legislative Auditor's report includes an image of the information available to law enforcement officers in the DVS Database, and neither medical information nor a Social Security number appear to be available.  (Report at 34.)  Moreover, in her complaint and brief, Myers failed to offer any plausible support for her allegation that the DVS Database contains any medical information on her or her Social Security number, beyond the fact that she had to provide some of that information when applying for a driver's license.  Indeed, Myers's attorney backed away from this claim to some extent at oral argument.   As a result, this Court concludes that Myers has not alleged sufficiently a violation of her constitutional right to privacy and will grant the defendants' motion to dismiss as to this claim.[14]

---

[14] Similarly, to the extent Myers argues that the defendants violated her Fourth Amendment right to be free from unreasonable searches and seizures, the Court rejects that argument because she has failed to provide any support for the claim that she has a reasonable expectation of privacy in her driver's license information.  *See United States v. Mathias*, 721 F.3d 952, 957-58 (8th Cir. 2013).  Finally, because Myers has failed to show that she suffered any constitutional injury, the Court rejects her *Monell v. Department of Social Services*, 436 U.S. 658 (1978), claim against entity and supervisor defendants.  *See Brockinton v. City of Sherwood, Ark.*, 503 F.3d 667, 674 (8th Cir. 2007); *Anderson v. City of Hopkins*, 805 F. Supp. 2d 712, 722-23 (D. Minn. 2011).

## C.     INVASION OF PRIVACY

Minneapolis and the other cities and counties also argue that Myers has failed to plead sufficiently a common law invasion of privacy claim. (Compl. ¶¶ 335-40.) Minnesota first recognized a claim for invasion of privacy in 1998. *Lake v. Wal-Mart Stores, Inc.*, 582 N.W.2d 231, 235 (Minn. 1998) ("[W]e recognize the tort of intrusion upon seclusion."). Of the three causes of action recognized in that decision as falling under the umbrella of invasion of privacy, *id.*, Myers alleges intrusion upon seclusion specifically. (Compl. ¶ 336.)

"Intrusion upon seclusion occurs when one intentionally intrudes, physically or otherwise, upon the solitude or seclusion of another or his private affairs or concerns . . . if the intrusion would be highly offensive to a reasonable person." *Lake*, 582 N.W.2d at 233 (internal quotation marks omitted). Intrusion has three elements: "(a) an intrusion; (b) that is highly offensive; and (c) into some matter in which a person has a legitimate expectation of privacy." *Swarthout v. Mut. Serv. Life Ins. Co.*, 632 N.W.2d 741, 744 (Minn. Ct. App. 2001).

The question of whether an intrusion would be highly offensive to a reasonable person is one of fact, generally reserved for the jury, unless "reasonable persons can draw only one conclusion from the evidence." *Id.* at 745. Factors to consider in this analysis are "the degree of intrusion, the context, conduct and circumstances surrounding the intrusion as well as the intruder's motives and objectives, the setting into which he intrudes, and the expectations of those whose privacy is invaded." *Bauer v. Ford Motor Credit Co.*, 149 F. Supp. 2d 1106, 1109 (D. Minn. 2001). Publication of nude

photographs constituted intrusion upon seclusion in *Lake*, 582 N.W.2d at 235; obtaining and publicizing private medical information did not meet that standard in *Swarthout*, 632 N.W. 2d at 745.

As discussed above, Myers has not alleged sufficiently that any defendants were able to access her medical information or Social Security number information via the DVS Database. Instead, her complaint focuses on the defendants' obtainment of her standard driver's license information, including her name, date of birth, driver's license number, address, driver's license photo, weight, height, and eye color. (Compl. ¶ 50.) Given that the obtaining and publicizing of private medical information does not constitute an invasion of privacy under Minnesota law, the Court concludes that any obtainment of Myers's driver's license information, which is less sensitive than private medical information, also does not constitute an intrusion upon Myers's seclusion. *See Mallak*, 9 F. Supp. 3d at 1064-65 ("Plaintiff has failed to sufficiently allege the existence of an intrusion that could be considered by a jury to be 'highly offensive' or that is based on a 'legitimate expectation of privacy.'"); *Rasmusson*, 991 F. Supp. 2d at 1077-79 (same).

### D.   DPS COMMISSIONERS

Finally, Myers makes claims against the current, and former, Commissioner of the Department of Public Safety. (Compl. ¶¶ 119-252, 253-75, 317-34, 335-40.) In response, the DPS cites this Court's prior decision in *Gulsvig*, in which the Court dismissed similar DPPA and Section 1983 claims against the same two Commissioners.

2014 WL 1285785, at *9.   In her response, Myers does not appear to address that decision, nor does she provide any persuasive reasoning as to why the Court should reject its prior decision.   (Pl.'s Resp. to Def. Commissioners Mot. to Dismiss or Sever, July 15, 2014, Docket No. 38.)   As a result, the Court will dismiss Myers's DPPA and Section 1983 claims as to the Commissioner defendants.[15]

## IV.   SEVERANCE

The defendants also seek severance of Myers's claims.   Federal Rule of Civil Procedure 20(a)(2) allows for the permissive joinder of defendants if "any right to relief is asserted against them jointly, severally, or in the alternative with respect to or arising out of the same transaction, occurrence, or series of transactions or occurrences" and "any question of law or fact common to all defendants will arise in the action."   Fed. R. Civ. P. 20(a)(2).   The defendants argue that the allegedly wrongful acts in this case are independent, although similar, acts, committed by various unrelated defendants across the state.   As a result, they contend that severance under Rule 20 is appropriate.   *See Bass*, 998 F. Supp. 2d at 825 (deciding that severance was proper because a "plaintiff may not join defendants on the mere basis of **similar** transactions – the rule permitting joinder requires that [a right to relief] arise from the **same** transactions" (internal quotation marks omitted)).

---

[15] For the reasons discussed in the preceding section, the Court will also dismiss Myers's common law invasion of privacy claims against the DPS Commissioners.

The Court concludes that severance is not appropriate at this stage of the proceedings.  It is not yet readily apparent whether the alleged wrongdoing in this case amounts to a series of unrelated actions, or is more systemic.  As a result, for the sake of convenience, the Court will deny the motion for severance.  *Mosley v. Gen. Motors Corp.*, 497 F.2d 1330, 1333-34 (8th Cir. 1974).

## ORDER

Based on the foregoing, and the records, files, and proceedings herein, **IT IS HEREBY ORDERED** that:

1.      The City of Minneapolis's Motion to Dismiss [Docket No. 7] is **GRANTED**.

2.      Defendants Aitkin County, Cass County, Cook County, Crow Wing County, McLeod County, and Mille Lac County's Motion to Dismiss or Sever [Docket No. 16] is **GRANTED in part** and **DENIED in part** as follows:

      a.      To the extent the motion seeks to dismiss DPPA claims based on DVS Database look-ups that took place on or after February 20, 2010 (thirty-two in total), the motion is **DENIED**.

      b.      To the extent the motion seeks severance for those DPPA claims not dismissed, the motion is **DENIED**.

      c.      To the extent the motion seeks to dismiss the claims arising out of the three look-ups by the Crow Wing County Probation office (three in total), the motion is **GRANTED**.

       d.     In all other respects, the motion is **GRANTED**.

3.     Defendant Cities of Baxter, Chaska, Crosby, Nisswa, Pequot Lakes, and Waite Park's Motion to Dismiss or Sever [Docket No. 24] is **GRANTED in part** and **DENIED in part** as follows:

       a.     To the extent the motion seeks to dismiss DPPA claims based on DVS Database look-ups that took place on or after February 20, 2010 (three in total, including  one by the Waite Park, Minnesota, Police Department and two others by the Little Falls, Minnesota, Deputy Registrar, which did not join the cities' motion in this case), the motion is **DENIED**.

       b.     To the extent the motion seeks severance for those DPPA claims not dismissed, the motion is **DENIED**.

       c.     In all other respects, the motion is **GRANTED**.

4.     Defendants Ramona Dohman and Michael Campion's Motion to Dismiss [Docket No. 33] is **GRANTED**.

DATED:  December 29, 2014
at Minneapolis, Minnesota.

                            s/ John R. Tunheim
                              JOHN R. TUNHEIM
                        United States District Judge